786

[907 NYS2d 419]

In the Matter of MARYANN CAMPBELL et al., as Parents and Guardians of EMILY FUQUI SVENNINGSEN CAMPBELL, an Infant, to Compel CHRISTINE SVENNINGSEN et al. to State and Render an Account of Their Proceedings as Cotrustees of the Inter Vivos Trust Created on July 20, 1995 by JOHN SVENNINGSEN, Deceased, for the Benefit of EMILY FUQUI SVENNINGSEN and Others. (And Three Other Related Proceedings.)

Surrogate's Court, Westchester County, September 9, 2010

## APPEARANCES OF COUNSEL

*Bertline, Hufnagel, Headley, Zeltner, Drummond & Dohn LLP*, Scarsdale (*Stephen Hochhauser* of counsel), for Maryann Campbell and another. *Cahill Gordon & Reindel LLP*, New York City (*Joan Murtagh Frankel* of counsel), for Christine Svenningsen and another. *Wiggin & Dana, LLP*, New York City (*Robert W. Benjamin* of counsel), for Christina Svenningsen and others. *Carton & Rosoff P.C.*, White Plains (*Robin D. Carton* of counsel), guardian ad litem.

## OPINION OF THE COURT

ANTHONY A. SCARPINO, JR., S.

Pending before the court are four applications by Maryann Campbell and Fred Cass (petitioners), as guardians of the property of their daughter Emily Fuqui Svenningsen Campbell, to compel Christine Svenningsen and/or Fanny Warren to account as follows: as cotrustees of an inter vivos trust created in 1995 by John Svenningsen (decedent); as cotrustees of testamentary trusts under decedent's will; and by Christine as executor of decedent's estate.

Emily was born in China on xx/xx/1995. In May 1996, decedent and Christine adopted Emily in China. In 2004, seven years after decedent's death, Christine surrendered Emily for adoption by petitioners. These unusual facts present the same question, whether pursuant to Domestic Relations Law § 117 (2) (a) the second adoption terminated Emily's interest under certain trusts decedent created. Respondents[1] move to dismiss the petitions on the ground that petitioners lack standing to compel the accounts because Emily is no longer an interested

---

1. Following the initial submission of the motions, the court directed the parties to obtain jurisdiction over all persons interested in the trust and appointed a guardian ad litem for Emily. Three of decedent's adult children appeared by counsel. By decision and order dated June 21, 2010, Christina Anne Svenningsen was authorized to represent two infant children. The children take the same position as Christine and Fanny. Collectively they are referred to herein as respondents.

party. Petitioners seek summary judgment that Emily shares in such trusts in the same manner as decedent's other five children, thus they have standing to compel Christine and Fanny to account. The guardian ad litem appointed for Emily supports that position.

We turn first to a review of the facts related to decedent's estate.

Decedent died testate on May 28, 1997. He was survived by his wife Christine and six children, Christina Anne, Jon Anders, Elisabeth Anne, Melissa Anne, Sara Elvera and Emily. In her probate petition, Christine identifies decedent's six children as his distributees and sets forth their respective shares under his will. Decedent's will dated March 17, 1997 was admitted to probate and letters testamentary issued to Christine. Letters of trusteeship issued to Christine and Fanny.

Under his will, decedent disposed of his preresiduary estate as follows: to Christine his personal property, real property located in Connecticut and California, and $10,000,000; and to his issue an amount equal to the federal unified estate tax credit, such share to be held in trust for the benefit of any child under the age of 40. Decedent disposed of his residuary estate in trust for the benefit of Christine. Upon Christine's death, the principal of the marital trust shall be distributed to decedent's "then living issue, *per stirpes*" (ARTICLE FOURTH [A] [2] [c]). Where funds are to be distributed to a child under the age of 40, decedent directs that the funds be held in a trust for the benefit of such child in accordance with the terms of ARTICLE EIGHTH. Under ARTICLE TWENTIETH (B), decedent provides that the term

> " 'issue' as used in this will shall include children who have been legally adopted at the date of my death as well as children with respect to whom legal adoption proceedings had been commenced prior to the date of my death though not completed at the time of my death."

Emily fits the foregoing definition. At the time decedent executed his will, he and Christine had adopted Emily; however, a readoption proceeding in Family Court was pending.[2] None of decedent's other children are expressly named in the will. It is

---

2. In 1997, it was common practice for parents who had adopted a child from China to seek to readopt their child in order to seek his/her United States citizenship (*see* Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law § 115-a, at 201). The law has since changed obviating the necessity for a readoption proceeding.

undisputed that following decedent's death, Emily's interest in the credit shelter trust vested.

During his lifetime, decedent created two irrevocable inter vivos trusts. The first trust, dated July 20, 1995, is entitled "Svenningsen Family Irrevocable Trust Number One" (the 1995 Trust). Decedent and Fanny were the cotrustees. Christine and Fanny are now acting as the cotrustees. The primary purpose of the 1995 Trust is to benefit decedent's children. The 1995 Trust grants the independent trustee with discretion to distribute income and/or principal to any member of the class, without any requirement that distributions be equal, or even that distributions be made in any given year. Upon the oldest child attaining the age of 30, the trustees are directed to divide the fund "into the number of equal shares required to provide one equal share for each child of the Settlor then living" and said shares shall be held in further trust until such child attains the age of 40 (ARTICLE FIRST [D]). The class of "children" is defined under ARTICLE TWENTY-FIFTH which provides, in part, as follows: *"Definition of Children . . .* References to the Settlor's children shall be deemed to mean each of the Settlor's children, CHRISTINA ANNE, MELISSA ANNE, ELISABETH ANNE and JON ANDERS, and any additional children born to or adopted by the Settlor after the creation of this Trust." When decedent created the 1995 Trust Emily had not yet been adopted and Sara was not yet born. All of decedent's children are under the age of 30 years. Following Emily's adoption by decedent she became a member of the class of permissible beneficiaries.

By a trust agreement dated October 24, 1996 (the 1996 Trust) entitled "Svenningsen Family Irrevocable Trusts," decedent established six equal and separate trusts for each of his children until such child attains the age of 40. Each of decedent's six children, including Emily (who had been adopted) and Sara (who had been born), is expressly named in the trust. Decedent and Fanny were the trustees. Upon decedent's death, Christine succeeded him as a cotrustee.

The facts surrounding the second adoption of Emily by petitioners are as follows.

Christine states that in 1995 she and decedent decided to adopt a child from China. In November 1995, they filed an adoption petition. Christine states that decedent was diagnosed with cancer in March 1996 and did not travel with her to China to finalize the adoption.

Petitioners have provided the court with a "Notarial Certificate of Adoption" dated May 8, 1996 which was issued in China.

In addition, petitioners submit a copy of an "Agreement for Parties to an Adoption Registration" (the adoption agreement) wherein the adopters, decedent and Christine, agreed not to have the adoptee, Emily, readopted and that "[t]he adoptee shall have the right to inherit the adopters' estate."[3] Upon returning home from China, an announcement of Emily's adoption was sent to friends and family.

Thereafter, decedent and Christine filed a petition in New York to readopt Emily (Domestic Relations Law § 115-a [8]). The readoption proceeding was not completed before decedent died. Christine filed a readoption proceeding as the sole parent which relief was granted.

In December 2004, Christine surrendered her parental rights over Emily. The parties differ as to the facts which precipitated the surrender and second adoption. Christine maintains that Emily was a difficult child and unable to bond with the family. Petitioners suggest that Christine may have wanted to terminate Emily's interest in decedent's estate. In December 2003, Christine placed Emily at the Devereux Glenholme School based upon a diagnosis of reactive attachment disorder. The staff at Devereux did not concur with that diagnosis. Petitioners worked at Devereux. Maryann states that after Emily was enrolled at Devereux petitioners would often care for her on weekends. In 2004, Christine informed Emily that she was going to surrender her for adoption. As noted, Christine signed a form surrendering guardianship and custody of Emily to Spence-Chapin Services to Families and Children. It appears that Emily has thrived living with petitioners.

Petitioners' application to adopt Emily was granted by order dated May 18, 2006. Maryann states that she and her husband were never informed of Emily's interests in decedent's estate. She did learn from Rick Antle, Christine's financial advisor, that decedent had arranged for funds to be made available for Emily's medical needs and her future education. While Maryann sought a copy of the relevant document, she states that it was not provided to her. Mr. Antle did send petitioners a

---

**3.** Whether Christine is personally obligated to provide for Emily under the Chinese adoption agreement is not before the court. That issue involves a dispute between living parties. However, in their papers, petitioners assert a claim that Emily is entitled to a share of decedent's estate in accordance with such agreement. Emily's status as a third-party beneficiary/creditor does entitle petitioners to compel the executor to account. In view of the determination herein, petitioners may address the agreement in the judicial account to be filed by the executor.

proposed agreement seeking their consent to separate Emily's interests under the 1995 Trust and 1996 Trust from those held for the benefit of decedent's other children. Petitioners did not sign the proposed agreement. Christine states that in the course of seeking to restructure the family's trusts she was advised that the adoption by petitioners terminated Emily's interest in the testamentary trusts and the 1995 Trust. It is undisputed that at the time of the second adoption, neither Spence-Chapin nor the Family Court were advised of Emily's interests under decedent's will, the 1995 Trust or the 1996 Trust (collectively referred to as decedent's estate plan).

Domestic Relations Law § 117 (2) (a) provides that upon the making of an order of adoption:

> "adopted children and their issue thereafter are strangers to any birth relatives for the purpose of the interpretation or construction of a disposition in any instrument, whether executed before or after the order of adoption, which does not express a contrary intention or does not expressly include the individual by name or by some classification not based on a parent-child or family relationship."

Subdivision (2) (d) provides further that "[t]he provisions of this subdivision shall not impair or defeat any rights which have vested on or before the thirty-first day of August, nineteen hundred eighty-six, or which have vested prior to the adoption regardless of when the adoption occurred."

Domestic Relations Law § 117 clearly provides that where a child is adopted out of a family unit the child's right to inherit from that family is terminated subject to several exceptions. First, where a child is expressly named in the instrument he or she takes. Emily is expressly named in the 1996 Trust, but not expressly named in decedent's will or the 1995 Trust. The second exception applies where a beneficiary's interest has vested. Whether Emily's interest in either trust vested prior to the adoption is a preliminary consideration. Finally, in the event Emily's interest in the marital trust and 1995 Trust did not fully vest prior to the second adoption, the question is whether decedent expressed a contrary intent to include her within the class of beneficiaries.

There is no dispute that Emily is a beneficiary under the 1996 Trust as she is expressly named therein (Domestic Relations Law § 117 [2] [a]).

It is also undisputed that Emily's interest under ARTICLE THIRD (D) of decedent's will, the credit shelter, vested at decedent's

death. As noted, Emily's share of the credit shelter was to be distributed to a sub-trust to be created for her benefit until she attains 40 (ARTICLES THIRD, EIGHTH). Christine and Fanny state that following a federal estate tax audit, the Internal Revenue Service increased the value of decedent's gifts by taking into consideration the 1996 Trust. Thus, the credit shelter was slightly under $120,000 with Emily's share approximating $20,000. Instead of funding Emily's sub-trust under ARTICLE EIGHTH, Christine and Fanny distributed her share to the sub-trust created for her benefit under the 1996 Trust. Petitioners are not required to accept the fiduciaries' decisions and are entitled to review their conduct in the context of an accounting proceeding.

Similarly, following her adoption by decedent, Emily became a member of the class of permissible beneficiaries of the 1995 Trust. Each beneficiary has the right of withdrawal with respect to contributions and if not exercised, such right lapses to the extent of the greater of $5,000 or 5% of the trust assets. From December 20, 1997 through December 15, 2003, distributions were made to Christine on Emily's behalf of varying amounts ranging from $6,000 to $11,000 which the fiduciaries assert exceeded 5% of the trust value. Christine and Fanny assert that all powers of withdrawal granted to Emily prior to the second adoption have lapsed in their entirety. They argue that as a result they should not be required to account. Again, petitioners have the absolute right to examine the trustees' actions in the context of a judicial account.

However, the period for which Christine and Fanny must account, and the question whether petitioners are entitled to an account of the marital trust, turns on a construction of decedent's will.

Respondents focus on whether the 1995 Trust and the marital trust required survivorship in order for Emily to have a continued interest. Each instrument creates a condition precedent, e.g., being alive when the oldest child turns 30 (the 1995 Trust) and being alive when Christine dies (the marital trust) (*see Matter of Larkin*, 9 NY2d 88 [1961]; *Matter of Bogart*, 62 Misc 2d 114 [1970]; *Estate of Levy*, NYLJ, Dec. 20, 1989, at 28, col 2). However, the inquiry does not end there. The critical question here is whether decedent expressed an intent contrary to the default rule under Domestic Relations Law § 117 (2) (a).

The paramount rule in all construction proceedings is to ascertain decedent's intent (*Matter of Fabbri*, 2 NY2d 236

[1957]; *Matter of Walker*, 64 NY2d 354 [1985]; *Matter of Gautier*, 3 NY2d 502 [1957]). The testator's/settlor's intent is gleaned not by focusing on any one word or provision, but from a sympathetic reading of the entire instrument (*Matter of Cord*, 58 NY2d 539 [1983]; *Matter of Larkin*, 9 NY2d 88 [1961]; *Matter of Piel*, 10 NY3d 163 [2008]). Here, a careful reading of decedent's will and his two irrevocable trusts, together with the circumstances existing at the time the instruments were executed, demonstrates his intention to include Emily as a beneficiary of his estate plan for all purposes.

In 1986 the legislature amended section 117 of the Domestic Relations Law in response to the decision by the Court of Appeals, *Matter of Best* (66 NY2d 151 [1985]). Prior to *Best*, the law was that absent an express exclusion of an adopted-out child from sharing a class gift, he/she was included (*see Matter of Bissell*, 74 Misc 2d 330 [1973]).

*Best* concerned the interests of an out-of-wedlock child, unknown to most of the natural family, whose adoption records had been sealed. In *Best*, the Court of Appeals set forth a default rule to comport with powerful public policy considerations which "militate against construing a class gift to include a child adopted out of the family" (66 NY2d at 155). The three major policy considerations engendering the change by the *Best* court were: (1) maintaining confidentiality of adoption records; (2) preserving the stability of real property titles (e.g., ensuring the finality of estates); and (3) assimilating the adopted child into the adoptive family (*Matter of Best*; *see also Matter of Murphy*, 6 NY3d 36 [2005]).

Following *Best*, the Law Revision Commission (the Commission) issued a report entitled "Recommendation of the Law Revision Commission" which provides a thorough analysis of the rights of adopted-out persons. The Commission first examined recommendations made to the legislature in 1963 by the Bennett Commission which had proposed legislation that would completely sever the relationship of an adopted-out child from his/her natural family. The Commission observed in its report that the policy concern of privacy, existing in 1963, was overly broad in light of societal changes and the "recent surge in attempts of adoptive children to discover their 'roots.' " (Rep of Law Rev Commn at 14, Bill Jacket, L 1986, ch 408, at 23, 1986 McKinney's Session Laws of NY, at 2573.) It did not consider the goal of privacy to be a paramount policy consideration.

The Commission noted in its report that

"[d]espite these valid concerns [set forth in *Best*], it appears that where the intent of the testator is clear (i.e., from the remaining language of the instrument or from the circumstances surrounding the execution of the instrument) that an adopted out child *is* to take pursuant to a class gift, such intent will be honored by the courts" (Rep of Law Rev Commn at 5-6, Bill Jacket, L 1986, ch 408, at 14-15, 1986 McKinney's Session Laws of NY, at 2564-2565).

And, it recognized that "adopted-out children are not all similarly situated" (Rep of Law Rev Commn at 22, Bill Jacket, L 1986, ch 408, at 31, 1986 McKinney's Session Laws of NY, at 2581; *see Matter of Lippincott*, 141 Misc 2d 186, 190 [1988]).

The resulting statute, Domestic Relations Law § 117 (2) (a), appears then to be a hybrid of the principles set forth in *Best* and the concerns raised by the Commission. The statute explicitly provides that a testator or grantor may express a contrary intent thereby entitling a person adopted out of the family to share in a class gift. Clearly, the statute impresses a duty upon the court to construe instruments in order to ascertain whether a testator or settlor intended that an adopted-out child would share in a class gift. The Commission's prescience is apparent in two decisions which followed the 1986 changes to Domestic Relations Law § 117 wherein an adopted-out child and the issue of an adopted-out child were included in a class gift (*Matter of Murphy*; *Matter of Lippincott*).

In *Lippincott*, the court held that decedent intended to include her adopted-out granddaughter, Dyann, as a recipient of a class gift to "granddaughters." Dyann was one of three granddaughters, the children of decedent's only daughter. When she was 2½ years old, Dyann was placed with another family because her mother was seriously ill. After her mother died, and decedent executed her will, Dyann was adopted by the family with whom she lived. The facts in *Lippincott* differ markedly from those present in *Best*. The court distinguished the matter before it from *Best* finding that none of the compelling policy considerations existing in *Best* and underlying the amendment to Domestic Relations Law § 117 were present. After Dyann was placed with the other family she continued to maintain a relationship with decedent, her adoption occurred when she was an adult and she is named in decedent's will as a beneficiary of tangible personal property. Based upon those facts, the court found that decedent intended Dyann to share in the class gift to granddaughters.

In *Matter of Murphy*, the Court of Appeals recognized that a testator may intend to include as a beneficiary a person who would otherwise be considered a stranger as a result of an adoption, and found that such inclusion extended to the adopted-out child's issue. The testator in *Murphy* placed her infant child, known as Clair, with a couple who raised him. Clair was adopted in 1944 when he was 19 years old. Sometime after the adoption, Clair and decedent established a relationship. Some 40 years later, decedent executed a will under which she gave Clair a cottage, money and one half of her residuary estate. Clair predeceased decedent.

The question before the Court of Appeals in *Murphy* was whether Clair's children were entitled to inherit his share under the anti-lapse statute, EPTL 3-3.3, which provides that a bequest to issue does not lapse but vests in the beneficiary's surviving issue. Because the anti-lapse statute pertains only to issue or brothers and sisters, the executor of decedent's estate argued that Clair's children were not entitled to his share. The Court of Appeals distinguished the facts of *Murphy* from the policy considerations underlying its decision in *Best*. In *Murphy*, none of the *Best* policy concerns existed, there was no need for confidentiality, nor to ensure finality of the distribution of an estate, nor to assimilate Clair into his adoptive family (*Matter of Best*; *see also Matter of Murphy*). The court found that the bequest to an adopted-out child "made him a nonstranger" (6 NY3d at 42), and such status applied to his issue. Clair's children were held to be entitled to receive his share pursuant to the anti-lapse statute.

Comparatively, in a matter similar to *Best*, the Court of Appeals found in *Matter of Piel* (10 NY3d 163 [2008]) that an adopted-out child was not included as a member of a class gift under an inter vivos trust. There, the settlor's daughter had a child out of wedlock who had been adopted by third parties. In its opening paragraph, the Court of Appeals states that the appeal presented the "same scenario" as *Best* but for the fact that the instruments involved were irrevocable trusts. The court found that the strong policy considerations "determinative in *Best* equally determine[d] [*Piel*] . . . ." (10 NY3d at 165.)

*Lippincott*, *Murphy* and *Piel* make clear that a determination whether an adopted-out child is included as a member of class gifts will depend upon the testator's/settlor's intent as expressed in the instruments and the particular facts and circumstances of the matter which may or may not trigger the application of the *Best* policy considerations.

As with *Murphy* and *Lippincott*, none of the policy considerations set forth in *Best* are present here. Emily has fully assimilated into her adoptive family, there is no need to protect the confidentiality of adoption records, and decedent's estate will be distributed as he intended and as the Svenningsen family believed it would be for eight years following his death. The only difference here is that Emily is not specifically named in the will and the 1995 Trust. However, Emily is referred to by attribution under both instruments: under ARTICLE TWENTIETH (B) of decedent's will issue *"shall include children who have been legally adopted at the date of my death as well as children with respect to whom legal adoption proceedings had been commenced though not completed at the time of my death"* (emphasis added); and under ARTICLE TWENTY-FIFTH of the 1995 Trust issue include *"any additional children born to or adopted by the Settlor after the creation of this Trust"* (emphasis added). The inclusion of such language is the equivalent of expressly naming Emily as a member of the class gifts. To hold otherwise would render those provisions meaningless.

A review of decedent's estate plan also makes clear that he intended to provide equally for each of his children. Any other determination would result in inconsistent findings as to Emily's status as a beneficiary of decedent's estate plan, and with respect to each instrument. For example, Emily's share of the credit shelter bequest vested at decedent's death to be held in trust until she reaches 40 years. It would be illogical to find that Emily is not a member of the class entitled to share in the remainder of the marital trust which is created under the same instrument where decedent provided her with a trust equal to her share of the credit shelter amount. Such was the case in *Murphy* and *Lippincott* where the courts found that the naming of the adopted-out child in the will was evidence of the testator's intent to also include the child, or his issue, as a member of class gifts. Here, expressly naming Emily in the 1996 Trust, and by attribution identifying her as a member of the class gifts under the 1995 Trust and will, establishes decedent's intent.

Notwithstanding the fact that decedent provided each of his children with an equal share of his estate, the court is asked to conclude that he would have intended to disinherit a child from his/her share by virtue of an act he could not have foreseen and over which he had no control. Notably, it was not until petitioners refused to sign the agreement that respondents believed that to be the case. Following decedent's death, the parties

recognized that Emily was entitled to share equally with her siblings in his estate. Emily was identified as decedent's distributee in the proceeding to probate his will. Christine "re-adopted" Emily, and thereafter for nearly seven years held her out as decedent's child for purposes of administering decedent's estate and trusts. And, in the context of the surrender and adoption proceeding, Christine did not advise anyone that Emily's interests in decedent's estate would terminate as a result of the second adoption.

Moreover, the improbability that decedent even considered that Christine would surrender any of their children for adoption after his death cannot be ignored. While a testator could state in a will or trust that his/her child's interest shall not terminate even if that child is later surrendered for adoption by the surviving parent, the likelihood of any parent anticipating such event is highly improbable, as is the drafting for such a contingency. When construing a will or trust, a court should not presume that a testator would anticipate an unforeseeable event.

Based upon all of the foregoing, the court finds that Emily's interests under decedent's will and the 1995 Trust fully vested subject only to the condition of her survival as provided under the instruments. As a result of this determination, petitioners, as Emily's guardians, have standing to seek to compel Christine and Fanny to account. Accordingly, within 90 days of service of a copy of an order to be settled herein, accounts shall be filed as followed: by Christine Svenningsen as executor; by Christine Svenningsen and Fanny Warren as cotrustees of the testamentary trusts; and by Christine Svenningsen and Fanny Warren as cotrustees of the 1995 Trust.